UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY ALEXANDER,
LILLIAN CLAYTON,
TINENO FERGUSON,
DARRIAN FORD SR.,
ANN GARDNER,
MARGARET GAREY,
DEBORAH GRAHAM,
MARIEDTH GREATHOUSE,
BRENDA HARMON,
PEARLY HARRIS,
LAVADA HOLLINGS,
WILLIE HOYLE,
KIM ISOM,
AREATHA MURPHY,
AARON ROLLING,
SARAH SMITH and
DAVID WEIR,
       Plaintiffs,

                                    Case No. 4:06-cv-129

-v-

                                  HONORABLE PAUL L. MALONEY

ATLANTIC AUTOMOTIVE COMPONENTS
and VISTEON CORPORATION,
       Defendants.

---

<u>ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE EXCESS PAGES,
MOTION FOR LEAVE TO SEAL MEDICAL DOCUMENTS, AND MOTION FOR LEAVE
TO FILE EXHIBITS</u>

<u>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AS TO COUNTS IV, V, VI, VI (SIC) OF PLAINTIFFS' COMPLAINT</u>

      This Court has before it Defendant Atlantic Automotive Components and Defendant Visteon

Corporation's motion (Dkt. No. 120) for summary judgment. Plaintiffs filed a motion for leave to

file excess pages and attached, as an exhibit, a sixty-nine page response. Defendants filed a reply

(Dkt. No. 179) to Plaintiffs' proposed response. This Court has read the motion, briefs, supporting

documents and relevant authority.  This Court finds oral argument is unnecessary to resolve the issues raised.  *See* W.D. M ICH. L.C IV.R. 7.2(d).

## I. BACKGROUND

The factual predicate for this action has been outlined in two previous orders resolving earlier motions for summary judgment.  *See Alexander v. Atlantic Auto. Components*, No. 1:06-cv-129 (W. D. Mich. filed Aug. 15, 2008) (Maloney, J.); *Alexander v. Atlantic Auto. Components*, No. 1:06-cv-129, 2007 WL 708629 (W.D. Mich. Mar. 5, 2007) (Enslen, J.).  This case arises out of an investigation into whether hourly employees of Defendant Atlantic were misreporting their earnings to the Unemployment Insurance Agency (UIA).[1]  Misreporting income caused the employees to receive unemployment benefits for periods during which they also received wages from Defendant Atlantic.  Both parties have included a statement of facts.  The respective statements differ substantially on what each  party considers relevant to the disposition of the motion.

A.  Defendants' Brief

Defendant Atlantic determined at least 198 employees had filed incorrect earnings reports with the UIA.  Defendant Atlantic's Director of Human Resources Bertha (Bert) Lillie and her assistant Laura Wilson prepared summaries of the misreports for each of the 198 employees based on the information in each employee's personnel file.  (Defendants' Exhibit 45 - Wilson Deposition at 87; Plaintiffs' T. Exs. 71-73.)  Of those 198 employees, Ms. Lillie and Ms. Wilson determined roughly one quarter of the employees made less significant errors, such as transposing numbers, reporting net instead of gross income or reporting no income for a week where they received holiday, vacation, or training  pay.  (*Id.* at 107-108.)  The remaining employees were suspended on

---

[1]Until December 2003, the Michigan's UIA was known as the Michigan Employment Security Commission (MESC).

December 8, 2004 and scheduled for interviews over the next few days.  (*Id.* at 107, 144-145.)

As a result of the interviews, most of the suspended employees were terminated outright on December 16.  (Wilson Deposition at 184; Plaintiffs' D. Ex. 456 - typed list of employee names.) Of the remaining 39 suspended employees, on December 21, sixteen were given disciplinary suspensions and then allowed to return to work and the other 23 terminated.  (Wilson Deposition at 183-186; Plaintiffs' D. Ex. 457 - handwritten list with two columns of employee names.)  The union filed grievances on behalf of the 129 employees who were terminated.  Six employees were chosen as representative examples and their cases were submitted to an arbitrator.  (Defendants' Exhibit 51 - Arbitration Decision.)  The arbitrator upheld all six terminations.  (*Id.*)  After the arbitration, Defendant Atlantic and the Union settled the remaining grievances.  As part of the settlement, Defendant Atlantic agreed to place on a preferential rehiring list any employee whose misreports to the UIA totaled less than $758.57, the highest amount of any misreporting by the sixteen employees who were suspended, and later reinstated.  The Union, in return, agreed to dismiss the remaining grievances.  As a result, 104 of the 129 grievances were dismissed with prejudice and 25 employees were placed on the preferential rehiring list.

B.  Plaintiffs' Response[2]

Plaintiffs devoted the first twenty-nine pages of their sixty-nine page brief outlining their counterstatement of relevant facts, including the relationship between the parties, Defendants'

---

[2]Plaintiffs attach more than 300 exhibits to their response, organized under three different labels.  Plaintiffs attach a series of numbered exhibits labeled "Exhibit #," but neglected to include Exhibits 6-9.  Plaintiffs' subsequent motion for leave to file exhibits (Dkt. No. 178) requests leave to file the missing Exhibits.  Plaintiffs also attach a series of consecutively numbered exhibits labeled "T. Ex. #."  These exhibits are complete copies of approximately seventy depositions.  Finally, Plaintiffs attach a series of nonconsecutively numbered exhibits labeled "D. Ex.#."  Plaintiffs have also filed two boxes of medical records along with a motion to seal those medical records (Dkt. No. 149).

financial situation starting in 2003, the investigation into the misreporting of employment earnings, and the arbitration proceedings[3].  Plaintiffs assert Defendants were in a financial crisis for a variety of reasons, and had started laying off employees in an effort to reduce their labor force as early as June 2003.  (Plaintiffs' Response at 9.)  Plaintiffs argue health care costs were an area of major concern for Defendant Atlantic.  Plaintiffs argue Peter Bergman, Atlantic's President from March 2003 to July 2004, was directed by Visteon to cuts costs, including health care costs.[4]  (*Id.*) Plaintiffs summarize other health cost cutting efforts, such as shifting to a PPO.  (*Id.*)

Plaintiffs find curious Atlantic's decision to investigate misreports to the UIA.  Plaintiffs argue Atlantic received UIA forms weekly and quarterly, which summarized the benefits drawn by its employees.  (Plaintiffs' Response at 12.)  Plaintiffs argue there is no dispute that Defendant Atlantic failed to use those reports to do any cross checking until October 2004.  (*Id.*)  Ultimately, Katherine Edwards, a human resources employee at Atlantic, was terminated for failing to report to management information regarding the problem with employees receiving unemployment benefits.  (*Id.* at 13.)

Plaintiffs provide details regarding the unemployment benefits investigation.  In early

---

[3]The arbitration proceedings are discussed on page 24 through page 29 of Plaintiffs' brief.  Plaintiffs refer to the arbitration proceeding in a number of places throughout the brief. Plaintiffs attempt to use portions of the testimony at the arbitration proceeding to establish the standards which were used to terminate employees.  (Plaintiffs' Response at 25-26.)  Plaintiffs suggest the arbitration proceeding, as structured, was a no-win situation for the Union.  (*Id.* at 26 n. 31.)  To the extent Plaintiffs argue some sort of impropriety in the arbitration process, Plaintiffs must seek recourse under the Federal Arbitration Act.  *See Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906, 911 (6th Cir. 2000).

[4]Plaintiffs cite D. Exs. 574-576 and 578.  These documents are copies of a template titled "Meeting Profile."  The time and date for each meeting is filled in, along with some other data. At the bottom of each document are between one and three sentences summarizing the topic of the meeting.

October 2004, Ms. Lillie assigned Ms. Wilson a project which required Ms. Wilson to compile a spreadsheet which contained "employee names, dates of layoffs, etc." (Plaintiffs' Exhibit 13 - Email.) A follow-up email dated October 18 from Ms. Lillie to Ms. Wilson is titled "Confidential Project" and asks how Ms. Wilson is progressing on the "URGENT PROJECT!!!!!" (*Id.*) Later that day, Ms. Edwards sent an email to Ms. Wilson titled "OCB Overpayments" which states "Bert said you are doing a spreadsheet on the OCB overpayments. What information do you need from me to include on the spreadsheets?" (Exhibit 14 to Plaintiffs' Brief - Email.)[5] In an email dated October 19 from Ms. Wilson to Ms. Edwards, Ms. Wilson asks if she would "print the Earnings Statements (by year) for each of these individuals? These are our top hitters thus far."[6] (*Id.*) Plaintiffs then identify the various documents on each employee used to create the spreadsheets. (Plaintiffs' Response at 17-18.)

Curiously, Plaintiffs place what they claim to be a critical aspect of their theory of the case in a footnote. (Plaintiffs' Response at 18 n. 25.) Plaintiffs state "[u]nderstanding how the information found on an employee's Unemployment Summary ("summary") was collected and utilized by Atlantic is absolutely critical to an understanding of this lawsuit." (*Id.*) At the end of the lengthy footnote, Plaintiffs conclude "Atlantic and Visteon decided to terminate or discipline employees before the UIA had formally advised them that an employee had wrongfully collected benefits." (*Id.*) The basis of Plaintiffs' conclusion is that the difference between what the employees reported to the UIA and what Atlantic paid the employees was what Plaintiffs assert was used to make suspension and termination decisions in December 2004. The benefits the employees

---

[5]In their brief, Plaintiffs failed to provide any reference to an exhibit for the source of this quotation. The statement was located in Exhibit 14.

[6]The list contains thirty-four names.

improperly received, however, were not calculated by the UIA until 2005 and the amounts the UIA calculated were "typically . . . less than what appears at the bottom of [Defendant Atlantic's spreadsheet]." (*Id.*)

This motion addresses four counts in Plaintiffs' six count complaint.[7] Count IV alleges a violation of Michigan's Persons With Disabilities Civil Rights Act (PWDCRA). Count V alleges a violation of Section 501 of the Employee Retirement Income Security Act (ERISA). The first Count VI alleges a violation of the Family Medical Leave Act (FMLA). The second Count VI alleges Defendant's conduct constitutes intentional infliction of emotional distress.

## II.  LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions together with the affidavits show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts

---

[7]The complaint does not contain a Count III, but does contain two Count VIs. Counts I and II were dismissed by Judge Richard Enslen (*Alexander v. Atlantic Auto. Components*, No. 1:06-cv-129, 2007 WL 708629 (W.D. Mich. Mar. 5, 2007) (Enslen, J.)) and Plaintiffs' second Count VI was dismissed by this Court (*Alexander v. Atlantic Auto. Components*, No. 1:06-cv-129 (W. D. Mich. filed Aug. 15, 2008) (Maloney, J.)) through earlier motions.

showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574.  The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## III.  ANALYSIS

### A.  Count IV - Violation of PWDCRA[8]

Count IV applies to Plaintiffs Alexander, Garey, Greathouse, Harris, Hoyle and Weir.  (*See* Complaint §¶¶ 258-263 and 274.)  To establish a violation of the PWDCRA, MCL § 37.1201 *et seq.*, a plaintiff must show (1) he or she is disabled as defined by the Act, (2) the disability is unrelated to his or her ability to perform the required duties, and (3) he or she has been discriminated against in one of the ways outlined in the Act.  *Peden v. City of Detroit*, 680 N.W. 2d 857, 864 (Mich. 2004).  The PWDCRA also prohibits discrimination against individuals whom the employer regards as having a disability.  MCL § 37.1103(e)(iii); *Michalski v. Bar-Levav*, 625 N.W.2d 754, 759 (Mich. 2001).  Plaintiffs do not allege in their complaint that any of the six are disabled, and instead alleges that Defendants perceived each of the Plaintiffs to have a disability which limited their ability to work.  (Complaint ¶ 275.)

Defendants argue the six Plaintiffs asserting Count IV have not established a *prima facia* case under the PWDCRA.  (Defendants' Brief at 8.)  Defendants assert Plaintiffs have no evidence that they were perceived as disabled by their employer.  Citing the depositions of the six Plaintiffs involved, Defendants argue those Plaintiffs have admitted they have no evidence that they were

---

[8]This Court has jurisdiction over this state law claim under 18 U.S.C. § 1367.

regarded as disabled.  Plaintiff responds Plaintiff Weir testified he has a learning disability.[9]

Plaintiff asserts

> [i]t would become quickly evident to most people that Mr. Weir would be someone who would be regarded very quickly as someone who has some type of disability. Because for Mr. [sic] Lillie it appears image was important as evidenced by the physical characteristics she appears to have sought for at least most of the group of 16, it may very [sic] Ms. Lillie perceived Mr. Weir handicapped even though he was able to do his job.

(Plaintiffs' Response at 68.)

Plaintiffs' response strains credulity.  Plaintiffs completely concede their claim as to Plaintiffs Alexander, Garey, Greathouse, Harris and Hoyle.  Plaintiffs' response utterly fails to point to any documentary evidence  which would support their claim that Defendants perceived Plaintiff Weir as having a disability.  Plaintiffs do not dispute the documentary evidence presented by Defendants.  Plaintiffs' assertion that most people would regard Plaintiff Weir as having a disability is simply that, an unsupported assertion.  Plaintiffs have not moved to amend their complaint to assert discrimination based upon an actual disability.  Defendant Weir was questioned in some detail about whether he had any indication that his disability or other physical ailments were a motivating factor in his termination.  (Plaintiffs' T. Ex. 50 - Weir Deposition at 61-68; Defendants' Exhibit 43.) When viewed in a light most favorable to Plaintiffs, Plaintiff Weir presents evidence that other employees, but not his employers, perceived him as having a disability.  Accordingly, Defendants are entitled to summary judgment as Plaintiff has failed to establish a prima facia case or a genuine issue of material fact on whether Defendants perceived the six Plaintiffs as disabled.

B.  Count V - Violation of ERISA

---

[9]Of Plaintiffs' sixty-nine page response, one paragraph, roughly one-half page in length, is dedicated to answering Defendants' motion as to Count IV.

1. *Prima Facia* Case

Count V applies to all Plaintiffs.  Section 510 of ERISA prohibits discriminating against individuals for exercising any right to which he or she is entitled  under an employee benefit plan or interfering with the attainment of any right to which the individual may become entitled to under the plan.  29 U.S.C. § 1140.  In the absence of direct evidence of discrimination, a plaintiff may establish a claim under the *McDonnell Douglas*[10] burden shifting approach.  *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992).  Using indirect or circumstantial evidence, a plaintiff may avoid summary judgment by showing evidence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may be entitled.  *Id.* (quoting *Gavalik v. Continental Can Co.*, 859 F.2d 834, 852 (3d Cir. 1987)).  To state a claim under section 510, a plaintiff must establish that Defendants had a specific intent to violate ERISA.  *Schweitzer v. Teamster Local 100*, 413 F.3d 533, 537 (6th Cir. 2005); *Humphreys*, 966 F.2d at 1043.  However, the plaintiff is not required to show the employer's sole purpose for discharging him or her was to interfere with the rights under the benefit plan, rather it must be a motivating factor in the adverse decision.  *Id.*  In addition, a plaintiff alleging a violation of section 510 must demonstrate a causal link between the adverse employment decision and the loss of benefits.  *Schweitzer*, 413 F.3d at 537.  The Sixth Circuit has held a short proximity in time may, in some cases, be sufficient to establish causal connections.  *See Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 629 (6th Cir. 2008) (reviewing circuit cases finding causal connections and circuit cases rejecting causal connections based on proximity in time and concluding that the temporal proximity, standing alone, must be within a few months in order to allow a fact finder to infer a

---

[10]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

causal connection).

Defendants argue Plaintiffs cannot establish a *prima facia* case because they cannot establish they were discharged for the purpose of interfering with their health insurance rights to which they are entitled.  (Defendants' Brief at 12.)  Defendants cite portions of Plaintiffs' depositions where Defendants allege Plaintiffs testified Plaintiffs have no evidence they were terminated for the purpose of interfering with their health insurance benefits.[11]  Defendants argue Plaintiffs were terminated because they misreported facts to the UIA and received unemployment benefits when they should not have received them.  Defendants argue Plaintiffs have all admitted they entered their earnings into the UIA unemployment computer system.  Defendants assert each Plaintiff has admitted they collected unemployment compensation through the UIA they were not entitled to receive.[12]  (Defendants' Brief at 20.)

Defendants also assert that many of the employees who returned to work had significantly higher insurance costs than the Plaintiffs.  (Defendants' Brief at 14.)  Defendants submit two charts attempting to compare health care claims between four groups of employees: (1) employees who were retained (53 total - 17 listed), i.e. not suspended or terminated; (2) employees who were reinstated (16 total - all listed), i.e., suspended and then reinstated after the investigation; (3) employees who were terminated (129 total - 17 listed); and (4) Plaintiffs (17 total - all listed).[13]

---

[11]Defendants cite to pages from each Plaintiff's deposition except for Plaintiff Ford.

[12]Defendants cite to pages from each Plaintiff's deposition.

[13]Defendants attach correspondence with Plaintiffs' counsel in which they stipulate that the data contained in spreadsheets of information compiled by Blue Cross Blue Shield, the administrator of Defendant Atlantic's self insured health care plan (Plaintiffs' D.Exs. 745, 746 and 747 - *See* Plaintiffs' response brief at 10 n. 18), is admissible.  (Defendants' Exhibit 52.) Plaintiffs have not objected to the chart in their response to Defendants' motion.

(Defendants' Brief at 15.)  The first chart purports to list the 17 highest total amount of claims for individuals in each category of employees.  The range for the each category includes the following: (1) retained - $154,300 to $16,796, (2) reinstated -  $208,925 to $157, (3) terminated - $123,032 to $34,363, and (4) Plaintiffs - $123,032 to $2,751.  The second chart identifies the average claims per employee for each category of employees.  The retained category averaged $22,056 per person, the reinstated category averaged $23,916 per person, the terminated category averaged $17,930 per person, and Plaintiffs averaged $29,060 per person.  Defendants point out the average claims for the terminated employees was $5,000 to $6,000 less than the average claims of the employees who were retained.  Defendants also point out that more than half of the Plaintiffs had claims below the average of the 53 retained employees and the 16 reinstated employees.[14]

In response, Plaintiffs argue there is evidence from which a fact finder may infer that Defendant Atlantic's actions were motivated by a desire to interfere with Plaintiffs' health care benefits and disability benefits.  (Plaintiffs' Response at 31.)  Plaintiffs argue Defendants' financial situation in December 2004 was dismal.[15]  Plaintiffs concede that financial stress and cost reduction

---

[14]The Court notes one of the sixteen employees who were reinstated had significantly more health care costs than the other fifteen.  (Defendants' Brief at 15, figure 1.)  In fact, her total was more than the other fifteen reinstated employees combined.  Given how much that one individual skews the average, removing her health care costs from the list results in an average for the reinstated employees of $11,648.60.  Looking at all sixteen reinstated individuals, the median health care cost was $10,990.  The median health care cost for Plaintiffs was $14,441.

[15]In the statement of facts portion of their brief, Plaintiffs point to various documents establishing Defendant Atlantic's financial situation.  Peter Bergman testified that in 2002 and 2003, Atlantic was experiencing an economic slowdown like the rest of Michigan.  (D. Ex. 56 - Bergman Deposition at 32-33.)  Ford Motors redesigned and simplified a part for one of their trucks which caused Atlantic to lose a significant revenue stream.  (*Id.* at 33.)  Mr. Bergman, with others, developed business plans designed to reduce costs, including workforce reductions. (*Id.* at 58-62.)  In February 2004, Mr. Bergman wrote a letter to salaried and office personnel outlining the state of the business for the year 2003.  (Plaintiffs' Exhibit 27.)  The letter outlined certain cost cutting measures.  In March 2004, Vito Cerra, then a vice president for Atlantic, sent

strategies, including workforce reductions, "standing alone will generally not suffice to establish intent to make out a § 510 violation." (*Id.* at 31-32.)  Plaintiffs argue, without the financial stress, "it is  much less likely that the actions complained of in this complaint would have occurred." (*Id.* at 32.)

Plaintiffs argue three facts, supported by various documents, clearly establish an intent to interfere with their employee benefits.  First, Plaintiffs allege Defendants tracked health care expenses.  (Plaintiffs' Response at 32.)  Plaintiffs point to various documents which establish that Defendants were concerned about health care claims, that they sought to reduce health care costs and that they were pleased with reports showing reduced health care costs.  Second, Plaintiffs allege Defendants tracked high medical claims on an individual basis.  (Plaintiffs' Response at 32-35.) Plaintiffs point to documents prepared monthly by Blue Cross Blue Shield which show medical claims paid for the previous month in chronological order and identifying the employee or dependent and the amount paid.  The reports for October (Plaintiffs' D. Ex. 748) and November 2004 (Plaintiffs' D. Ex. 749) produced during discovery have handwritten notes which Plaintiffs allege show "individualized attention being paid to some claims." (*Id.* at 33.)  Four of the names on D. Ex. 748 and D. Ex. 749 appear on the charts included in Defendants' Brief.[16]  Plaintiffs assert the marks were made by Viki Jonatzke, the benefits administrator.

---

an email explaining that two directors' jobs had been eliminated and absorbed and that his position was being eliminated as the result of Atlantic's financial situation.  (Plaintiffs' Exhibit 25.)  Plaintiffs identify any number of other documents which support the conclusion that Defendant Atlantic's revenue projections were not being met and that it was faced with rising costs and declining sales.

[16]Three of the names appear on the "terminated" column, one appears on the "reinstated" column.  Of the three names in "terminated" column, one of the three is a Plaintiff and also appears in the "Plaintiffs" column.

Plaintiffs discuss some the other names with marks next to them.  One individual with two claims for over $6,000 each has written next to his name "T 9/20/04."  (Plaintiffs' D. Ex. 749.)  Ms. Lillie recalls this individual quit in September 2004 because he was on disability and could no longer work.  (Plaintiffs' T. Ex. 64[17] - Lillie Deposition at 40-41).  Plaintiffs note this individual had more than $50,000 per year in health care claims paid for the years 2001 through 2004.  (Plaintiffs' Exhibit 2 - Spreadsheet Claims Paid Per Year.)  A second individual who had a monthly health care charge of $27,240.28 has the word "wow" written, the date circled, and the words "term BCBS 10/1/04" written on the November 2004 health care cost printout.  (Plaintiffs' D. Ex. 749.)  For the years 2002 through 2004, this individual had health care costs of $1,113.54, $3,593.37 and $33,503.59 respectively.  (Plaintiffs' Exhibit 2.)  This individual was one of the 53 individuals whose misreports were due to less significant errors and was not suspended.  In August 2004, this individual was placed on involuntary layoff.[18]  (Lillie Deposition at 46.)[19]  Ms. Lillie testified she did not recall why this individual was placed on involuntary layoff.  (*Id.*)  Finally, Plaintiffs note a third individual who does not have any handwritten marks next to her name.  (D. Ex. 749.)  This individual had health care claims totaling over $1,000 that were paid by Defendant Atlantic in October 2004.  (*Id.*)  Plaintiffs note, in 2004, Atlantic paid over $30,000 in health care for this individual.  (Exhibit 2.)  Plaintiffs assert this individual was terminated in December 2004.[20]

---

[17]Plaintiffs incorrectly identify this as T. Ex. 63.  (Plaintiffs' Brief at 34.)

[18]This Court notes the individual's name appears on the health care costs spreadsheet for the years 2001 through 2007.  (Plaintiffs' Exhibit 2.)

[19]Plaintiffs incorrectly identify this as T. Ex. 65.  (Plaintiffs' Brief at 34.)

[20]Plaintiffs explain this individual's name appears in left hand column for terminations located at D. Ex. 457.

Plaintiffs argue these documents establish Defendants tracked employees with high medical claims. Plaintiffs point out the temporal proximity to the time the marks were made to the unemployment investigation.

As further evidence that health care costs were a concern, Plaintiffs note, in 2004, two individuals with low health care costs were promoted.[21]  Plaintiffs argue one of these two individuals, before being promoted, misreported his income to the UIA.[22]

In their reply, Defendants argue the circumstantial evidence presented by Plaintiffs do not establish a *prima facia* case because it does not show that Defendants had the required intent to interfere with a right to which Plaintiffs were entitled. (Defendants' Reply at 2-4.) First, Defendants disagree that their financial situation was as dismal as it is portrayed by Plaintiffs.  Regardless of what the financial outlook for the company was, Defendants argue their labor needs for January 2005 were the same as their needs in the fall of 2004. (Exhibit 1 to Defendants' Reply - Deposition of T. Adams at 73; Plaintiffs T. Ex. 55.)

Defendants justify their tracking of health care claims.  Todd Adams, who worked in the finance department at Atlantic, prepared spreadsheets of Atlantic's monthly health care claims in order to estimate the expected health care costs.  (T. Adams' Deposition at 92.)  Mr. Adams explained he would get the spreadsheets supplied by Blue Cross Blue Shield from Viki Jonatzke and would paste the information into his own spreadsheet to calculate costs incurred but not reported (IBNR).  (*Id.*)  Mr. Adams' spreadsheet could track costs incurred but not reported as well as

---

[21]Plaintiffs reference D. Ex. 452 and "Lillie T. Ex. 65 p. 70."  (Plaintiffs' Response at 35.)  Ms. Lillie's deposition is T. Ex. 64, not 65.

[22]D.Ex. 741.  In a notice of restitution mailed in May 2005, the UIA alleged the individual owed $488 for overpayments in July and December 2001, July 2002 and July 2003.

14

average claims over a one year period and could look at different trends to see what was happening with health care claims.  (*Id.* at 93-95.)  Defendants argue they have a legitimate business reason for tracking health care costs and Plaintiffs have no evidence establishing that Atlantic tracked health care costs on an individual basis or made any termination decisions based on health care costs.

Defendants next address the two monthly health care cost reports with handwriting. Defendants agree with Plaintiffs that the handwritten marks on the reports were made by Ms. Jonatzke.  Defendants disagree that the marks establish anything of significance.  Neither Ms. Lillie nor Ms. Wilson included Ms. Jonatzke's name when asked who made the decisions regarding termination of employees.   (Lillie Deposition at 197-192; Wilson Deposition at 186-189.) Defendants point out only four of the twenty-five employees with marks next to their names were terminated.  Two of the twenty-five employees with marks next to their names were part of the group whose misreports did not merit suspension.  One employee with a mark next to her name was one of the sixteen who was initially suspended, but allowed to return to work after the interview. Defendants conclude the majority of employees with marks next to their names were not even suspended.[23] Defendants conclude the checkmarks are not evidence of specific intent to discriminate because most of the individuals with marks next to their names were not terminated and the person making the marks was not involved in the decision to terminate employees.

Finally, Defendants address Plaintiffs' argument that employees with lower health care costs were promoted to salaried positions.  Defendants argue Plaintiffs never applied for salaried positions and there is no allegation of discriminatory promotion.  Defendants argue thirty of the employees who were terminated for misreports had lower health care costs than one of the two individuals

---

[23]The Court notes some of the names with marks next to them were not necessarily employees of Atlantic, but were relatives of Atlantic employees covered by the health plan.

promoted.  (Defendants' Exhibit 52; Plaintiffs' Exhibit 2.)  Defendants argue fifty-six of the employees who had misreports, but were not discharged, had claims greater than that individual. (*Id.*)

Plaintiffs' evidence from which one might infer an intent to discriminate is best described as meager.  Plaintiffs have no direct evidence of an intent to interfere with benefits, and rely only on circumstantial evidence.  When taken in a light most favorable to Plaintiffs as the nonmoving party, Defendant Atlantic was experiencing financial problems in 2004, was concerned about health care costs, and the benefits administrator made note of the highest claims made in the months leading up to the mass suspension of employees for misreporting information to the UIA.  Viewed this way, the evidence does indicate some temporal proximity from which a trier of fact may infer an intent to interfere with benefits.  *See Hamilton*, 522 F.3d at 629.  Even if Ms. Jonatkze was not part of the group who made suspension and termination decisions, Ms. Lillie, who did make those decisions, signed both monthly health care cost reports, indicating she had the opportunity to view them.[24]  (D. Exs. 748 and 749.)  To be clear, not every employer who tracks health care costs and subsequently terminates employees has violated ERISA.  *See Schweitzer*, 413 F.3d at 539-540.  This Court concludes only that Plaintiffs have presented bare bones-minimally sufficient evidence from which a fact finder may infer an intent to interfere with benefits based upon the temporal proximity between the tracking of health care costs and the decision to terminate employees.  The Court emphasizes that this evidence is at the absolute outer edge of sufficiency to sustain a prima facia case.

---

[24]Ms. Lillie's signature appears on the last page of each document.  Ms. Lillie stated she did not know why the marks were made on the monthly health care costs summary and did not recognize the handwriting.  (Lillie Deposition at 24.)  Ms. Lillie denied making the marks.  (*Id.* at 30.)

2.  Pretext

Under the *McDonnell Douglas* approach, after a plaintiff establishes a *prima facia* case, the employer must articulate a legitimate non-discriminatory reason for the termination.  *Humphreys*, 966 F.2d at 1043.  If the employer provides a non-discriminatory explanation for its decision, the inference of discrimination raised by a plaintiff's *prima facia* case is transformed from a mandatory inference to a permissive inference which the fact finder may reach, provided the fact finder concludes the employer's explanation is unbelievable.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).  Assuming the employer makes such a showing, the burden shifts back to the employee to show that the reason articulated by the employer is a pretext  masking discrimination.  *Humphreys*, 966 F.2d at 1043.  "A jury may not reject an employer's explanation, however,  unless there is a sufficient basis *in the evidence* for doing so."  *Manzer,* 29 F.3d at 1083 (emphasis in original).  A plaintiff may undermine the employer's justification for its actions by establishing, through sufficient evidence, (1) the reason has no basis in fact, (2) the reason did not actually motivate the adverse action, or (3) the reason was insufficient to motivate the adverse action.  *Manzer,* 29 F.3d at 1084.  Through the first type of evidence, the employee would establish the employer's proffered explanation is factually false.  *Id.*  Through the second type of evidence, the employee concedes the factual basis underlying the employer's proffered explanation and that the employer's proffered explanation could motivate dismissal.  *Id.*  The employee offers evidence which "attempts to indict the credibility of the employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id.* (emphasis in original).  Through the third type of evidence, the employee would establish that other employees were not fired even though they engaged in substantially identical conduct to those

17

employees who were terminated. *Id.*

Defendants argue Plaintiffs cannot establish that the stated reason for terminations, the misreporting to the UIA, was a mere pretext for discrimination. (Defendants' Brief at 16.) Defendants contend all Plaintiffs testified that Defendant Atlantic informed each of them they were terminated because of their misreports to the UIA.[25] Defendants assert all parties involved in the decision making process have testified that Plaintiffs were terminated because of the misreporting. Defendants assert Ms. Lillie and Ms. Wilson have testified that the only information they reviewed when determining whether to discharge an employee was the unemployment reporting information.[26]

Defendants assert Plaintiffs' evidence attempting to establish pretext fails under all three of the approaches outlined in *Manzer*. Defendants argue Plaintiffs do not attempt to establish the allegation of misreporting information is factually false. Defendants contend Plaintiffs were treated the same as the other employees who were terminated for misreporting information to the UIA. Defendants argue the 53 employees who were not suspended or terminated and the 16 temporarily suspended employees were different from Plaintiffs only with respect to the UIA reporting. The 53 employees not suspended had less significant misreports. The 16 suspended employees were reinstated after an investigation of their misreports. Some employees not terminated suffered

---

[25]Defendants cite only to the depositions of Plaintiff Alexander, Garey, Greathouse, Harris, Hoyle and Weir.

[26]Defendants did not submit Mr. Lillie's deposition as an exhibit to their brief in support of this motion, although Plaintiffs did. Defendants do not cite to Ms. Wilson's deposition in the argument portion of their brief. However, in the factual summary portion of their brief, Defendants make the same statement. Ms. Wilson testified, in response to specific questions, what she did not consider when deciding whether to terminate an employee, but did not testify to what information was considered. (Wilson Deposition at 189-192).

various of medical conditions similar to and even worse than those Plaintiffs suffered.[27]   Some employees who used FMLA leave were not terminated.[28]

Plaintiffs argue there is sufficient evidence that the justification offered by Defendants is pretext.  (Plaintiffs' Response at 36.)   Plaintiffs attack the two justifications provided in the termination letters sent to former employees: (1) increase in the State Unemployment Tax (SUTA) and (2) dishonesty.  Plaintiffs offer two other reasons why Defendants' reasons were pretextual: (3) the lack of transparency in the standards for determining discipline and (4) evidence that the group of sixteen reinstated individuals was treated differently from the rest of the employees.  Plaintiffs allege not all employees who misreported information to the UIA were treated the same.  Plaintiffs identify five groups of employees, including the employees who did not misreport earnings.  The other four groups include (1) the employees who misreported earnings, but were not suspended, (2) the employees who were terminated on or before December 16, 2004, (3) the employees who were terminated by letter on December 21, 2004, and (4) the employees who were suspended for two weeks and then reinstated.

### a. SUTA

Plaintiffs argue the misreporting of employment earnings did not impact Defendants' tax rate.  (Plaintiffs' Brief at 37.)   The SUTA rate was a justification for termination in the letters Defendants sent to their employees in December 2004.  Defendants do not mention the SUTA as a legitimate, non-discriminatory reason for terminating Plaintiffs in their motion for summary

---

[27]Defendants cite portions of depositions from eleven individuals.  Four of the individuals are from the group of sixteen individuals who were suspended temporarily.

[28]Defendants cite portions of depositions from ten individuals.  Seven of the individuals are from the group of sixteen individuals who were suspended temporarily.

judgment.  Defendants have not undermined Plaintiffs' *prima facia* case with any reference to the SUTA rate.  Accordingly, Plaintiffs are under no obligation to establish the SUTA rate justification was merely pretextual.

b.  Dishonesty

Plaintiffs argue they did not intentionally misrepresent their earnings, but acknowledge "making mistakes in reporting to the UIA based upon information collected by Atlantic." (Plaintiff's Brief at 38.)  Plaintiffs argue they "readily offered to repay anything owed and many were puzzled why it took Atlantic so long to discover the existence of a problem." (*Id.*)  Plaintiffs suggest they are no different than another employee, Mr. McVay, who was given a restitution notice by the UIA and sent a check to the UIA the day of his interview.  (T. Ex. 33[29] - McVay Deposition at 55-56.)  Without referencing any exhibit, Plaintiffs argue the UIA notices of restitution mailed out in the spring of 2005 acknowledges that some misreporting may have been the result of an honest mistake as opposed to an intentional deception.  Plaintiffs also argue Ms. Wilson testified that not all employees were intentionally misreporting earnings and that some misreporting occurred as the result of a mistake.  (Wilson Deposition at 162-163.)

In their reply, Defendants argue Plaintiffs' offers came only after their dishonesty was discovered and their jobs were at risk, which does not deny their dishonesty at the time they misreported their earnings.  (Defendants' Reply at 5.)

Plaintiffs' argument that they offered to repay the improperly received benefits does not establish pretext under any of the evidence categories outlined in *Manzer*.  Plaintiffs' position that their mistakes were not intentional is not supported by any evidence.  Plaintiffs have not offered an

---

[29]Plaintiffs incorrectly cite Mr. McVay's deposition at T. Ex. 34.  Mr. McVay was one of the group of sixteen who was reinstated.  (Defendants' Exhibit 49.)

explanation for how their individual misreporting mistakes were made.[30]  Plaintiffs' offer to repay

benefits is not evidence that Defendants' conduct is more likely due to illegal motivation that their

proffered explanation.   Any offer to repay benefits came after the allegedly illegal conduct,

suspension and termination, not before it.   Plaintiffs claim they were treated differently than one

other employee, Mr. McVay, overlooks differences between them and Mr. McVay.  Mr. McVay

misreported his earnings to the UIA only one time.  (Defendants' Exhibit 49.)  He brought a copy

of the receipt for his restitution to the interview.  (*Id.*)  He also offered an explanation for how the

misreport occurred, including the telephone calls he made attempting to correct the misreport several

days after the problem occurred.  (McVay Deposition at 24-27.)

Plaintiffs' concern on this point appears to be centered on whether dishonesty necessarily

involves the intent to be dishonest.  There are two problems with Plaintiffs' position.  First, the

arbitrator considered and rejected this position.  (Arbitrator's Opinion at 12-14.)  Second, Plaintiffs

have not offered any authority to establish that their allegedly unintentional acts of misreporting

would not constitute dishonesty.  Plaintiffs argue there is no evidence they intentionally misreported

their earnings.  Even if true, there is undisputed evidence that Plaintiffs misreported their earnings.

There is also evidence that Defendants examined all of the misreports and opted not to suspend

employees whose misreports were obvious errors.  Defendants provided all the other employees who

had misreports, including Plaintiffs, the opportunity to explain why the misreports occurred.

### c. Lack of Transparent Standards for Discipline

---

[30]In their sixty-nine page response brief, Plaintiffs opted not to discuss any explanation
they might have offered Defendants for their misreports.  The Court will not scour Plaintiffs'
depositions in search of one.  *See Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir.
2007) (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 916 n. 7 (5th Cir. 1992)); *Cutts v.
Steelcase, Inc.*, No. 1:05-cv-36, 2006 WL 1722227 at * 7 (W.D. Mich. June 21, 2006) (Bell, J.).

Plaintiffs next assert Defendants' standards for deciding how to discipline each employee lacked transparency. (Plaintiffs' Brief at 39.) No document was ever prepared setting forth the standards that would be utilized to impose different levels of discipline on the employees for misreporting information to the UIA. (Exhibit 11 - Defendant Visteon's Answers to Plaintiffs' First Set of Interrogatories ¶ 5.) With regard to the employees who misreported information to the UIA, Ms. Lillie testified that Ms. Wilson, with counsel, made the decision which of those employees would be suspended and interviewed and which would not be suspended and interviewed. (Lillie Deposition at 187, 190.) With regard to the employees who were suspended and interviewed, Ms. Wilson testified she and Ms. Lillie made the decision to terminate individuals, often with counsel present.[31] (Wilson Deposition at 177-178, 184, 186, 189.) When pressed for standards for determining which employees would be terminated and which would be temporarily, Ms. Wilson testified "each employee was looked at individually to determine whether a termination or suspension would take place." (*Id.* at 186.) Ms. Wilson elaborated that she and Ms. Lillie considered the number of misreports, whether the employee reported some earnings or no earnings, whether the error occurred because the employee reported net as opposed to gross earnings, whether the reported earnings appeared to transpose numbers, whether there was vacation time paid in advance or if it was a funeral that was paid. (*Id.* at 186-187.) She added that the two also took into consideration, sometimes heavily, the explanation the employee gave for the misreport. (*Id.* at 189.) By December 16, 2004, a list was prepared identifying 104 employees for termination. (D. Ex. 456.)

---

[31]Later in their brief (Plaintiffs' Brief at 44), Plaintiffs point out Karen McDougall, the president of Atlantic, testified that to her knowledge, Ms. Wilson was not involved in determining who would be disciplined. (T. Ex. 66 at 148.) Plaintiffs incorrectly cite this as T. Ex. 67 at 146. Ms. McDougall also testified that the people who made the discipline decisions included herself, Ms. Lillie, Mr. Schlarman, attorneys from Miller Johnson, as well as a few others. (*Id.* at 98-99.)

By December 21, a second list identified another 23 employees for termination and sixteen employees for reinstatement.  (D. Ex. 457.)

Comparing the individuals who were reinstated to those who were terminated, Plaintiffs argue the criteria was not consistently applied.  (Plaintiffs' Brief at 46.)  Plaintiffs assert, without referencing any documents, one of the key factors for determining whether an employee was reinstated or terminated was whether he or she had reported zero earnings[32] when they had actually received earnings.[33]  Plaintiffs admit Ms. Wilson testified she did not look at any one factor, but reviewed the employee's entire situation.  Plaintiffs next argue that eight of them never reported zero earnings, but were terminated rather than suspended.[34]

Defendants take issue with Plaintiffs' contention that the standards used for suspensions and terminations were inconsistently applied.  (Defendants' Reply at 6.)  Defendants argue Plaintiffs' brief mischaracterizes Ms. Wilson's testimony.  Ms. Wilson consistently testified over the course

---

[32]"Zero earnings" refers a particular situation where an employee fails to report any earnings to the UIA.  If an employee received a check from Atlantic for any amount for work performed claimed none of the earnings to the UIA, that employee misreported zero earnings.  This situation is different from situations where an employee received holiday, vacation or training pay and failed to report any earnings.  The situation is also distinct from situations where an employee reported some, but not all, of his or her earnings to the UIA.

[33]In the factual summary portion of their brief, Plaintiffs discuss testimony by Ms. Lillie and Ms. Wilson from the arbitration proceeding.  Ms. Lillie testified that, as part of the criteria Defendants examined, everyone who worked and reported zero earnings should have been fired.  (Dkt. No. 11-15, Exhibit M to Plaintiffs' Response to Dkt. No. 6 - Arbitration Proceeding Transcript, Testimony of B. Lillie at 85 and 94.)  Ms. Wilson testified that the six individuals whose cases were presented at the arbitration proceeding were all terminated because they reported zero earnings when they had worked.  (*Id.,* Testimony of L. Wilson at 191.)

[34]The eight Plaintiffs in this group are R. Alexander, L. Clayton, T. Ferguson, A. Gardner, M. Garey, M. Greathouse, D. Graham, and A. Rolling.  The other nine plaintiffs did have one or more weeks of earnings in which they reported zero earnings to the UIA.  Plaintiffs reference Exhibit 4 as a summary.

23

of her deposition that each employee was considered on an individual basis using multiple factors including the number or misreports, the amount of earnings misreported, the possibility that a misreport was a simple mistake and the employee's explanation.  (Wilson Deposition at 186-187, 292-294, 296, 319-320, 346-347.)  Defendants argue Plaintiffs' attempt to isolate one factor as more important than others, such as whether an employee misreported zero earnings for a week, is not supported by Ms. Wilson's testimony.

Plaintiffs' evidence that Defendants discipline standards were not transparent and were not consistently applied does not establish that Defendants' proffered justification was pretextual. Plaintiffs' summary of the evidence establishes that there is some ambiguity as to who made the decision to terminate individual employees.  Plaintiffs' response brief does not raise the issue of transparency with regard to the initial suspension decision, rather, Plaintiffs raise the issue with regard to the decision to terminate some of the suspended employees while reinstating others. (Plaintiffs' Brief in Response at 40-44.)  Plaintiffs do not explain the material significance of this evidence of ambiguity, or how it implicates their allegation that Defendants' justification for the terminations is pretextual.   That evidence does not establish that the standards used were not consistently applied.   Ms. Wilson repeatedly testified that each employee was considered individually and a number of factors regarding the misreports were taken into account, including the employee's explanation for the misreports.  The isolated evidence of ambiguity does not sufficiently tend to show that the illegal motivation was a more likely explanation for Defendants' decision than the reason offered by Defendants even if evaluated in the light most favorable to plaintiffs.

Plaintiffs' argument on the issue of transparent standards appears to be an attempt to establish the third type of evidence discussed in *Manzer*.  Although not clear, Plaintiffs seem to

suggest that the group of sixteen employees who were reinstated were substantially similar to them. Plaintiffs select one of that group of sixteen as "base line" for comparison.  (Plaintiffs' Response at 46.)  Plaintiffs attempt to use the zero reported earnings criteria to establish a difference between them and the reinstated employees has absolutely no basis in evidence.  No person ever testified that the lack of a week where the employee reported zero earnings was a determining factor in a decision to *reinstate* a suspended employee.  At the arbitration hearings, Ms. Lillie and Ms. Wilson testified that everyone who reported zero earnings when they worked should have been *terminated*.  Plaintiffs admit only one of the reinstated employees misreported zero earnings.  (Plaintiffs' Response at 49.) That individual, as discussed below, established at her interview that she returned the check to the UIA.

Finally, Plaintiffs have two sentences buried in a paragraph where they suggest Defendants improperly took the weight of an employee into their termination decisions.[35]  (Plaintiffs' Brief at 47.)

### d.  Reinstated Employees Were Treated Differently

As their fourth argument to establish that Defendants' non-discriminatory reasons were

---

[35]Plaintiffs have prepared a spreadsheet (Exhibit 5) which includes, among other things, their heights and weights.  Plaintiffs state "it does appear for the following wrongfully terminated employees weight was one of the issues . . . .  For those with a week of misreports weight was an issue in the following cases. . . ."  (Plaintiffs' Response Brief at 47.)  Evidence of a plaintiff's weight is not evidence that the employer considered weight when making termination decisions.  Plaintiffs make no attempt to present any evidence that Defendants' considered weight to be an issue when deciding who to terminate.  Plaintiffs have presented no evidence from which this Court might infer weight was an issue.  Plaintiffs have not offered any points of comparison, such as whether all the individuals who were not suspended or were suspended and then reinstated weighed less than these Plaintiffs.  Even if that evidence was in the record, at best it would establish a *prima facia* case, but would not assist Plaintiffs in rebutting Defendants' proffered legitimate and nondiscriminatory justification for the terminations.

pretextual, Plaintiffs assert the sixteen employees initially suspended, but later reinstated, were treated differently than other employees.  Plaintiffs assert those employees whose names appear on December 21 list (Plaintiffs' D. Ex. 457) had an "evidence note" prepared by Ms. Wilson. (Plaintiffs' Response at 47.)  Ms. Wilson explained she prepared the evidence notes after the interviews "to understand what happened with the misreports."  (Plaintiffs' T. Ex. 72 at 268.) Plaintiffs comment that  the evidence notes were prepared for more than the employees whose names appear on the December 21 list, and some of the individuals who are on the December 21 list did not have evidence notes prepared.  Nine of the Plaintiffs did not have an evidence list prepared. Plaintiffs argue, with the exception of one individual, the sixteen reinstated employees did not have serious health problems.[36]  (Plaintiffs' Response at 48.)

Plaintiffs, of course,  are factually correct that the group of sixteen was treated differently because the sixteen were reinstated rather than terminated.  Plaintiffs must establish the reason the sixteen individuals were treated differently was impermissible.  Plaintiffs assert the difference between those employees who were reinstated and those employees who were terminated was that the sixteen had lower health care claims than the majority of those employees who were terminated. Referencing Defendants' chart of health care claims between 2001 and December 2004, the Court notes eight Plaintiffs have lower health care claims than nine of the reinstated employees.[37] (Defendants' at 15 - Figure 1.)

Plaintiffs discuss the misreported earnings for ten  former employees other than Plaintiffs.

_____

[36]As noted earlier, one individual had health care costs totaling more than the other fifteen combined.

[37]Nine of the reinstated employees had more than $10,000 in health care claims while eight Plaintiffs had less than $10,000 in health care claims during that period.

Five of the former employees were part of the group of sixteen who were reinstated.  The others were all terminated at some point after the investigation took place.  Plaintiffs argue the misreports for the reinstated group are not substantially different from their own misreports.  Plaintiffs, however, generally neglect to discuss their own misreports as a point of comparison.  Reviewing Plaintiffs' discussion of the various individuals does not convince the Court that the group of sixteen was somehow treated differently.  (*See* Plaintiffs' Response at 49-60.)  Ms. Schlitter, who has the highest health care claims for the group of reinstated individuals, had two instances where she misreported earnings.  At the interview Ms. Schlitter was able to prove she returned the benefits check to the UIA for one of those incidents.  (Plaintiffs' T. Ex. 43 - Schlitter Deposition at 21-22, 53; Defendants' Exhibit 49 - Unemployment Summary Evidence Notes.)  Mr. McVay had one instance of misreported earnings and he offered an explanation for the problem as well as evidence that he had just sent a check to the UIA pursuant to a restitution notice.  (McVay Deposition at 24-27.)

Defendants' information in December 2004 indicated Mr. Chandler misreported benefits four times.  Twice he failed to report four hours worth of earnings, one time he overreported his earnings and once he appears to have failed to report forty hours of vacation time.[38]  (Defendants' Exhibit 49.) Plaintiffs argue Defendants' information is incorrect and reference several documents.[39] (Plaintiffs'

---

[38]At his deposition, Mr. Chandler clarified that the two times he failed to report earnings he was paid for four hours of training classes, thus Mr. Chandler did not have any weeks of zero earnings.  (Plaintiffs' T. Ex. 5 - Chandler Deposition at 28.)

[39]Plaintiffs allege "Ms. Wilson should have discovered this problem because she sent to the UIA by letter dated May 24, 2005 a copy of his Restitution Notices which clearly showed the amounts he had failed to report.  See D.Exs 352, 476-484 and T. Ex. Pp. 371-386."  (Plaintiffs' Response at 52.)  Plaintiffs neglected to file D. Ex. 352, which this Court assumes is the letter referenced in the Plaintiffs' statement.  The other D. Ex. exhibits are either summaries of Mr. Chandler's misreports with Ms. Wilson's handwritten notes on them or printouts of a computer

Response at 52-53.)  Defendants decided to reinstate Mr. Chandler based on the information they had available at the time, not the information available in 2005.  Plaintiffs assert Mr. Chandler is a body builder[40] and asserts he "was the kind of physical specimen an employer involved in manufacturing would like to have around as he was just physically was [sic] the opposite of almost all of the Plaintiffs."  (*Id.* at 52.)  Plaintiffs suggest Mr. Chandler's appearance made a difference in the decision to reinstate him as his misreports were not fundamentally different from Plaintiffs' misreports.  Plaintiffs assertion is simply that, an unsupported assertion.

Plaintiffs argue handwritten notes from Mr. Constant's interview establish Defendants considered factors other than the misreports.  On Mr. Constant's misreport summary, Ms. Wilson wrote, among other things, "Great EE, no record, no attendance problems."  (Plaintiffs' Exhibit 30.) Plaintiffs argue that if Ms. Wilson was considering such factors "then most certainly others at Atlantic were doing it."  (Plaintiffs' Response at 53.)  Plaintiffs' assertion is not supported by any evidence.  Furthermore, Plaintiffs do not discuss Mr. Constant's health situation as a point of comparison.[41]  Plaintiffs conveniently overlook the other handwritten information on the exhibit, which provide explanations for the three misreports Mr. Constant filed.

Ms. Outlaw's misreport summary sheet identifies only one misreport.  (Defendants' Exhibit 49.) Plaintiffs argue Ms. Outlaw's sheet is not accurate.  As explained above, whatever inaccuracies were revealed later were irrelevant to the decisions made in December 2004.  Plaintiffs concede Ms.

_____

screen which have not been explained.

[40]In his deposition, Mr. Chandler admitted lifting weights two to three times a week. (Plaintiffs' T. Ex. 5 at 6-9.)

[41]Based on the health claims tables submitted in Defendants' brief, Mr. Constant had around $13,000 in heath care claims for the reported period.  (Defendants' brief at 15.)  Eight Plaintiffs had lower health care claims during the same time period.  (*Id.*)

Outlaw failed to report her earnings, which was a legitimate reason for her termination.

Plaintiffs next discuss Mr. Hall and Ms. Williams, two individuals who Plaintiffs allege "on or about May 9, 2004 . . . were terminated.  Up until that time they were part of the Group of 55 employees who were not suspended."[42]  (Plaintiffs' Response at 54.)  According to Ms. Wilson, Mr. Hall was not suspended as a result of the investigation because "I don't think we had the information initially."  (Wilson Deposition at 562.)  Later, he was terminated as a result of several misreports to the UIA.  (*Id.* at 563.)  Plaintiffs allege Mr. Hall had few medical claims and did not use FMLA.  Plaintiffs compare Mr. Hall to Plaintiff Harris, both of whom had estranged spouses and both of whom provided health care coverage for a time for those estranged spouses.  (Plaintiffs' Response at 55.)  Ms. Williams was terminated for filing misreports to the UIA, but was subsequently reinstated because "there was an error when I put together the summary, that brought her back."  (Wilson Deposition at 597-598.)  Plaintiffs assert Ms. Williams was around five feet tall, weighed over three hundred pounds, and used FMLA frequently in 2004.  (Plaintiffs' Response at 55.)  Neither of these individuals establish any sort of impropriety on the part of Defendants; both individuals, just like Plaintiffs, were terminated for misreports.

Plaintiffs' evidence regarding Mr. Hall and Ms. Williams does not establish that one group of employees received treatment different from another group of employees.  Ms. Wilson offered an explanation for why Mr. Hall was not initially suspended.  He was later terminated after

---

[42]Mr. Hall was terminated "May '05ish" according to Ms. Wilson's testimony.  (Wilson Deposition at 562.)  Plaintiffs do not cite any documents establishing when Ms. Williams was terminated.  The Court infers from the record that she was terminated as she was initially selected as one of the cases for arbitration, but she passed away before the arbitration took place.  (*See* Plaintiffs' Response at 55-56; Plaintiffs' T. Ex. 70 - Webster Deposition at 107-109.)  In May 2004 Mr. Hall and Ms. Williams could not have been part of the group of 55 not suspended because the unemployment investigation did not begin until October 2004.

Defendants discovered he misreported his earnings. The record establishes Mr. Hall was terminated for filing misreports, just like other employees. The evidence referenced by Plaintiffs regarding Ms. Williams generally fails to establish when she was terminated. Plaintiffs admit she was terminated for misreports to the UIA. (Plaintiffs' Response at 55.) Plaintiffs have not offered any explanation for her misreports. The record establishes Ms. Williams was terminated for filing misreports, just like other employees.

Plaintiffs argue Mr. Coleman, like Plaintiff Alexander and Plaintiff Rolling, had out-of-wedlock children on the health insurance he obtained through Defendant Atlantic. Plaintiffs argue, if the arbitration standards were applied consistently, Mr. Coleman should not have been terminated.[43]  (Plaintiffs' Response at 56.)  Plaintiffs also note that one of Mr. Coleman's two misreports was likely the result of an explainable reporting error. (*Id.* at 56-57.) Plaintiffs discuss Mr. Coleman's subsequent interactions with Defendant Atlantic, including his application for unemployment benefits, his reinstatement in May 2005, and his second termination later that year. Mr. Coleman's subsequent employment status is irrelevant for determining whether Defendants' acted improperly in December 2004. Mr. Coleman's parental situation does not establish that Defendants acted improperly. Plaintiffs have not established that Defendant Atlantic considered the number of individuals on an employee's benefits package. Plaintiffs have not established that

---

[43]Plaintiffs' argument here is confusing. The Court assumes Plaintiff is arguing that by the standards used for termination decisions to which Defendants testified at the arbitration hearing, Mr. Coleman should not have been terminated. According to Plaintiffs, Mr. Coleman had two misreports, one of which is an explainable error. (Plaintiffs' Response at 56-57.) Plaintiffs do not attempt to explain the second misreport, which would serve as a basis for his termination. Plaintiffs appear to be operating under the belief that so long as some earnings were reported, the employee would not be terminated. Plaintiffs can point to no testimony where that criteria is alleged. Plaintiffs also neglect to reference the exhibit where Mr. Coleman's unemployment summary is located.

Defendant Atlantic considered benefits information when determining whether to terminate an employee. According to the information available to Defendant Atlantic at the time, Mr. Coleman misreported his earnings to the UIA on at least two occasions, although one of those occasions could be explained as a simple error.

Plaintiffs provide information about Mr. Holmes, another former employee of Atlantic who was terminated. (Plaintiffs' Response at 58.) Plaintiffs argue, by the standards used at the arbitration hearing, Mr. Holmes should not have been terminated.[44] Plaintiffs discuss Mr. Holmes generally poor heath condition. Without referencing any documents, Plaintiffs indicate Mr. Holmes filed for unemployment benefits and prevailed, prompting Defendant Atlantic to file an appeal. (Plaintiffs' Response at 58.) Plaintiffs assert Mr. Holmes was offered reinstatement, but he found other work and declined the offer, speculating that Atlantic would merely "look for another excuse to terminate him and he did not want to put up with it." (Plaintiffs' Response at 59.)

Plaintiffs' discussion of Mr. Holmes does not establish any impropriety by Defendants. Plaintiffs' evidence does not show that Mr. Holmes' health status was taken into consideration when the decision was made to terminate him for his misreport. This Court has not been directed to any evidence supporting Plaintiffs' discussion of Mr. Holmes subsequent employment dispute with Atlantic. Even if there was some evidence in the record establishing the application for benefits, the appeal, and Defendants' offer for reinstatement, none of that evidence would implicate the propriety of Defendants' decision to terminate Mr. Holmes in December of 2004.

Finally, Defendants discuss Pamela Wilson, an hourly employee not to be confused with

---

[44]Again, Plaintiffs' statement is confusing. Plaintiffs admit Mr. Holmes had two misreports, one of which was related to training pay. Mr. Holmes other misreport was a sufficient reason for his termination.

Laura Wilson who worked in the Human Resources Department. Defendants assert Ms. Wilson should not have been discharged based on the arbitration standard.[45] Defendants assert Ms. Wilson's living arrangement likely factored into Defendants' decision to terminate her. (Plaintiffs' Response at 59.) Plaintiffs allege Ms. Wilson lived with another employee of Atlantic, Mr. Hall, who had his own health insurance through Atlantic. (*Id.*) As evidence, Plaintiffs point to the letter from Ms. Lillie to Mr. Murdock of the Michigan Economic Development Corporation. (Exhibit 20.) In that letter, one of the proposed classes which new employees could take under the proposed program would cover "marriage issues." (*Id.*)

Plaintiffs' evidence here does not demonstrate any impropriety by Defendants. Ms. Wilson misreported her earnings several times to the UIA. Plaintiffs again have not offered any evidence suggesting Defendants considered her living arrangements when deciding whether to terminate her. Plaintiffs have not established Defendants were even aware that the two individuals were not married and were living together.

Defendants have provided a legitimate, nondiscriminatory explanation for their conduct; Plaintiffs, along with other employees, misreported earnings to the UIA and were terminated. Accordingly, Plaintiffs have the burden to put forth evidence establishing Defendants' justification is a pretext masking discrimination. Plaintiffs did, in fact, misreport their earnings, thus they cannot establish that Defendants' proffered reason has no basis in fact. In order to conclude Defendants'

---

[45]According to Plaintiffs, this Ms. Wilson had six misreports, although Plaintiffs failed to refer the Court to any documentary evidence for their assertion. Yet again, Plaintiffs argument rests on the mistaken assumption that only those individuals who had earnings and failed to report them were terminated. The testimony at the arbitration proceeding was that those individuals who misreported zero earnings should have been terminated. No one testified that individuals who did not report zero earnings should not have been terminated or that those individuals should have been reinstated.

proffered reasons were pretextual, Plaintiffs must offer evidence which falls under the second or third categories outlined in *Manzer*.

Defendants are entitled to summary judgment on the ERISA claim.  The evidence set forth by Plaintiffs does not establish a genuine issue of material fact sufficient to survive Defendants' motion for summary judgment.  Plaintiffs have not established that an illegal motivation was *a more likely* explanation for Defendants' decision to terminate them than the reason offered by Defendants. The ambiguity and conflicting evidence regarding who made the decision to terminate employees support in some small measure plaintiffs' case.  Plaintiffs, however, have failed to establish that such question is an issue of <u>material</u> fact.  It has not been established that <u>whoever</u> the individual or individuals were who made the decision to terminate employees, did so for an impermissible purpose.  Furthermore, the evidence presented by Plaintiffs does not suggest that two groups of employees with substantially similar misreports were treated differently.  The record does establish that the employees were considered on an individual basis.  Those individuals who reported zero earnings should have been terminated.  Employees who were able to offer explanations for their misreports were generally reinstated.  Plaintiffs have not set forth any evidence suggesting, inferring or hinting that health care costs were considered when deciding which employees to terminate.  <u>In fact, the evidence in the record does not demonstrate any correlation between those employees with high health care costs and the employees who were terminated.</u>

C.  (First) Count VI - Violation of FMLA

The first Count VI applies to Plaintiffs Ferguson, Gardner, Graham, Harmon, Harris, Hoyle, and Weir.  (Complaint ¶ 290.)  A plaintiff may establish a violation of the FMLA through either a

theory of entitlement/interference under 29 U.S.C. § 2615(a)(1)[46] or a theory of discrimination/retaliation under 29 U.S.C. § 2615(a)(2)[47]. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007); *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 555 (6th Cir. 2006). To prevail on a claim under the entitlement/interference theory, a plaintiff must show (1) he or she is an eligible employee, (2) the defendant is an employer as that term is defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his or her intention to take leave, and (5) the employer denied the employee FMLA benefits to which he or she was entitled. *Killian,* 454 F.3d at 556; *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). An employee who is terminated after taking FMLA is denied benefits because he or she has not been restored to his or her former position or an equivalent one.[48] *Killian*, 454 F.3d at 556. To establish an FMLA retaliation claim, plaintiffs must demonstrate (1) they were engaged in an activity protected by the FMLA, (2) the employer knew the plaintiffs were exercising their rights under the FMLA, (3) after learning of the employees' exercise of their FMLA rights, the employer took an adverse action against the employees, and (4) there was a causal connection between the protected FLMA activity and the adverse employment action. *Killian*, 454 F.3d at 556. To establish a causal connection in the context of presenting a prima facia case, a plaintiff must put forth some evidence allowing a court to deduce a causal connection between the retaliatory action

---

[46]Section 2615(a)(1) provides "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

[47]Section 2615(a)(2) provides [i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

[48]29 U.S.C. § 1614(a)(1) provides that an employee who takes leave under FMLA is entitled to be restored to the same or an equivalent position upon returning to work.

and the protected activity.  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).[49]

In situations where a plaintiff relies on indirect or circumstantial proof when raising an FMLA

claim, the *McDonnell Douglas* burden shifting analysis is applicable.  *Skrjanc v. Great Lakes Power*

*Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

The complaint appears to raise a claim under the discrimination/retaliation theory of the

FMLA.  Plaintiffs allege, they "were terminated because they exercised their rights to use their

FMLA leave."  (Complaint ¶ 296.)  Defendants argue Plaintiffs cannot establish a *prima facia* case

of retaliation because they have no evidence establishing the fourth factor under that approach; they

have no evidence supporting a causal connection between the exercise of their FMLA rights and the

decision to terminate them.  (Defendants' Brief at 10.)  Defendants, citing  to excerpts from the

depositions of each of the seven Plaintiffs, allege Plaintiffs admit they have no evidence that they

were terminated for exercising their right to use leave under the FMLA.  Defendants, citing to other

excerpts of the depositions,  concede that some Plaintiffs speculated their decision to use FMLA

leave might have been a factor in the decision to terminate them.  Defendants conclude mere

speculation, without any evidence at this stage, is insufficient to survive summary judgment.

In their response, Plaintiffs allege they have an FMLA claim under both a theory of

discrimination/retaliation and a theory of entitlement/interference.  (Plaintiffs' Response at 61-62.)

Plaintiffs argue they have presented a *prima facia* case.[50]  Plaintiffs argue Defendants concede

---

[49]Defendants cite *Gibson v. City of Louisville*, 336 F.3d 511, 514 (6th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)) for the proposition that the taking of FMLA must be a determining and motivating factor in the employer's decision to discharge the employee.  Both *Gibson* and *Reeves* dealt with the evidence presented to the jury and not whether the plaintiffs established a *prima facia* case at the summary judgment stage.

[50]Plaintiffs do not specify whether their *prima facia* case falls under the entitlement/interference theory, the retaliation/discrimination theory, or both.

Defendant Atlantic is an employer subject to the FMLA, Plaintiffs are employees eligible to use leave under the FMLA and Plaintiffs were terminated. Plaintiffs point to evidence from their medical files establishing that they applied for and took FMLA leave in 2004.[51] Plaintiffs argue there is evidence to support a causal connection between their terminations and the exercise of their FMLA rights. Plaintiffs point to a number of exhibits which establish Defendants tracked their employees who took FMLA leave. (Plaintiffs' Exhibit 21,[52] D.Ex. 328,[53] T.Ex. 59,[54] a series of D.Exs.,[55] Exhibit 20[56].) Plaintiffs conclude the documents and exhibits establish a temporal nexus

_____

[51]Plaintiffs summarize FMLA leave for Plaintiffs Ferguson, Gardner, Graham, Harmon, and Weir. Plaintiffs do not mention Plaintiffs Harris and Hoyle. Plaintiff Ferguson used FMLA leave in October 2004. Plaintiff Garnder used FMLA leave in November 2004. (Plaintiffs' Exhibit 31.) Plaintiff Graham testified she used FMLA in 2004, but Plaintiffs have not established the months during which she took leave.. (Plaintiffs. T. Ex. 15 - Gardner Deposition at 74-86.) Plaintiff Harmon was on FMLA leave when she received her termination notice. (Plaintiffs' T. Ex. 19 - Harmon Deposition at 56-59.) Plaintiff Weir took FMLA leave in October 2004. (Plaintiffs' D. Ex. 337-338.)

[52]Exhibit 21(email from Peter Bergman - President). Mr. Bergman requests Ms. Lillie provide him with information summarizing all absenteeism, including the 35 people on FMLA

[53]D.Ex. 328 (form identifying individuals who have used FMLA including the dates of use and the number of hours used)

[54]Plaintiff incorrectly identifies this as T.Ex. 60 (deposition of K. Edwards at 145-148, 165-166). Ms. Edwards states that Ms. Lillie was "getting tough with the people that were on FMLA" because she thought the employees were abusing it and she wanted to make it tougher for the individuals to use their leave because so many people were missing work. Ms. Edwards explains that Mr. Lillie wanted the employees taking FMLA to bring medical statements in about every two weeks to establish that they were still eligible. Ms. Edwards identifies two employees, neither of whom are included among Plaintiffs, who were terminated for missing too much time and who also took a lot of FMLA leave. On page 166, Ms. Edwards was asked if Mr. Lillie ever targeted individuals for termination. Defense counsel objected on the grounds the answer required speculation. Ms. Edwards responded that it likely happened on occasion and gave two examples, neither of whom are included among Plaintiffs.

[55]D.Exs. 328, 329, 333, 337, 338, 339, 340 and 341. D.Ex. 328 is described earlier Plaintiffs did not file any exhibit labeled "D.Ex. 333." D.Ex. 329 is a spreadsheet identifying individuals who have taken FMLA leave and the beginning and end date of the leave. The other

36

between their use of FMLA and the decision to terminate them.

Plaintiffs also argue the proffered reason for their termination is a mere pretext. (Plaintiffs Response at 65.) Plaintiffs assert the pretext arguments under the ERISA portion of their brief are applicable here. Plaintiffs reference the November 10, 2004 "FMLA Active Recipients" list generated by Defendants. (D. Ex. 340.) Plaintiffs note Mr. Alexander, Ms. Gardner, Ms. Graham and Ms. Harmon's name appears. (*Id.*) Plaintiffs further note only two names from the group of sixteen reinstated employees, Mr. Chandler and Ms. Scheffler, appear on the same list.[57] (*Id.*) Plaintiffs note other names appearing on other FMLA recipient lists.

Plaintiffs argue Defendants used the zero earnings misreport standard discussed under ERISA to weed out those undesirable employees. (Plaintiffs' Response at 66.) "Many of the most costly and overweight employees had one week that fell into this category. Atlantic chose to disregard the fact that returning to work after a shutdown or layoff it was more likely the employee

---

five exhibits are spreadsheets identifying individual employees who took FMLA leave, the beginning and end dates of the leave, the eligible person, and the reason for taking the leave. One other category is included on some of the spreadsheets, "type of leave." The data in that category is either the word "intermittent" or an indication of a date something is due.

[56]Exhibit 20 (letter from Ms. Lillie to Mr. Kenneth Murdoch at the Michigan Economic Development Corporation). The letter appears have been sent after a meeting between the two where Mr. Murdoch reviewed Defendant Atlantic's Pilot Training Program. In the letter, Mr. Lillie justifies a procedure for evaluating employees because "once an employee is in the Union he/she will oftentimes abuse the Attendance Policy and FMLA." Apparently Mr. Murdock expressed some concerns about the training program and Mr. Lillie is proposing some changes. She proposes awarding employees who are hired into the program $1000 at the end of the year if they meet certain guidelines such as perfect attendance and attending three or more of eleven possible seminars.

[57]Forty-four names appear on the November 10, 2004 list. (*Id.*) The Court notes, of the seventeen names listed on Defendants' health care costs chart under the category "retained" (Defendants' Brief at 15), five names appear on the November 10 list: W. Allen, B. Buels, Y. Diggs, E. Schramm, and L. Williams.

would misreport a week as they had yet to receive a paycheck .when [sic] they called in via MARVIN on one of the first three days of the week." (*Id.*)

In their reply, Defendants argue they tracked FMLA leave in order to determine when each employee's leave expired.[58] (Defendants' Reply Exhibit 1 - Edwards' Deposition at 141-142.) Defendants explain they had to track each employee's use of leave under FMLA to ensure compliance with the Act. (Defendants' Reply at 8.) Defendants assert there is nothing improper about expressing concern that employees are abusing FMLA by taking leave when they do not qualify for it. Defendants argue the reforms implemented by Ms. Lillie made it harder for employees to take leave improperly, without denying leave for which the employees qualify.

Plaintiffs Ferguson, Gardner and Weir have presented sufficient evidence to establish a *prima facia* case under a theory of discrimination/retaliation. Similar to their evidence under the ERISA claim, Defendants' meager, but unchallenged, evidence here is sufficient to allow a fact finder to infer from a temporal proximity a connection between the Plaintiffs' use of FMLA and Defendants' decision to terminate them. Plaintiff Graham took leave in 2004, but Plaintiffs have not established when in 2004 the leave was taken. Thus, there is no evidence of temporal proximity from which the Court may infer a *prima facia* case. *See Hamilton*, 522 F.3d at 629. Plaintiff Harmon has presented sufficient evidence to maintain a claim under a theory of entitlement/interference as she was on FMLA leave when she was terminated.

Defendants, however, are entitled to summary judgment on the FMLA claim. Plaintiffs evidence here does not establish any improper conduct by Defendants. Defendants have established a legitimate, non-discriminatory explanation for their conduct. Plaintiffs have not established

---

[58]Defendants explain an employee may use 12 weeks of leave under the Act if the employee has worked 1,250 hours in the preceeding 12 months.

Defendants' explanation for their termination was pretextual. The list of FMLA users does not establish that an illegal motivation was a *more likely* explanation for Plaintiffs' conduct than the Defendants' explanation. Plaintiffs have not established, through evidence, that one group of employees were treated differently than another group for any impermissible purpose. Plaintiffs again misrepresents the standard for termination outlined at the arbitration hearing. Plaintiffs' bald assertion that overweight and unhealthy employees were likely to misreport zero earnings is completely unsupported by any evidence in the record. Plaintiffs cannot even offer any rational or coherent justification for that statement.

      D. (Second) Count VI - Intentional Infliction of Emotional Distress

      This count in Plaintiffs' complaint was the subject of a prior motion for summary judgment. *See* Dkt. No. 78 - Defendants' Motion for Summary Judgment on Count VI. In that motion, Defendants argued the state tort was preempted by federal labor law. The motion was granted on August 15, 2008. *See Alexander v. Atlantic Auto. Components*, No. 1:06-cv-129 (W. D. Mich. filed Aug. 15, 2008) (Maloney, J.). Here, Defendants argue Plaintiffs have no factual support for their claim, including a lack of evidence to support their claim that they have suffered an extreme emotional distress. (Defendants' Brief at 24). Plaintiffs response, which was filed months before the order granting Defendants' other motion for summary judgment, fails to address the factual basis for dismissing the tort claim. Had the earlier motion for summary judgment not been granted, this Court would have an obligation to dismiss the tort claim under this motion as Plaintiffs have failed to respond to this portion of the instant motion.

IV. CONCLUSION

      Defendants Atlantic and Visteon are entitled to summary judgment on the remaining the

claims remaining in Plaintiffs' complaint.  Defendants have established there are no genuine issues of material fact with regard to Plaintiffs' two state claims, Count IV (PWDCRA) and the second Count VI (intentional infliction of emotional distress).  Plaintiffs have established a *prima facia* case for their claims under ERISA and FMLA.  Defendants offered a legitimate, non-discriminatory justification for their conduct.  Plaintiffs did not offer sufficient evidence from which a fact finder could conclude that Defendants' explanation was pretextual.

### ORDER

1.    Plaintiffs' motion (Dkt. No. 149) for leave to file a response brief in excess of twenty-five pages is **GRANTED.**  Plaintiffs' response brief filed as an exhibit is **ACCEPTED.**

2.    Plaintiffs' motion (Dkt. No. 148) for leave to file Exhibits 6, 7, 8, and 9 to Plaintiffs' Response is **GRANTED.**

3.    Plaintiffs' motion (Dkt. No. 148) to seal medical files is **GRANTED.**

4.    Defendants' motion (Dkt. No. 120) for summary judgment as to Counts IV, V, VI, and VI [sic] of Plaintiffs' Complaint is **GRANTED.**  Plaintiffs' Counts IV (PWDCRA), Count V (ERISA), first Count VI (FLMA) and second Count VI (intentional infliction of emotional distress are **DISMISSED.  IT IS SO ORDERED.**


Date:   September 16, 2008                                    /s/ Paul L. Maloney
                                                              Paul L. Maloney
                                                              Chief United States District Judge